IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| FLOYD JUNIOR JAYCOX, | § | |
| Institutional ID No. 01220652, | § | |
| SID No. 05269759, | § | |
|        Plaintiff, | § | |
| | § | |
| v. | § | No. 5:23-CV-213-BV |
| | § | |
| TDCJ ID AGENCY, *et al.*, | § | |
| | § | |
|        Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Proceeding pro se and *in forma pauperis*, Plaintiff Floyd Junior Jaycox filed this action under 42 U.S.C. § 1983, claiming violations of his constitutional rights while incarcerated in the Texas Department of Criminal Justice (TDCJ) John Montford Unit. Dkt. No. 1. For the reasons explained below, the undersigned recommends that the United States District Judge dismiss all Jaycox's claims, except those brought under the Americans with Disabilities Act and the Rehabilitation Act based on the alleged denial of single-cell housing. As to those claims, the undersigned recommends that the district judge require Defendants TDCJ and Texas Tech University to answer or otherwise plead.

**1.    Procedural Background**

Jaycox filed this § 1983 action against numerous TDCJ employees, and the case was transferred for screening under 28 U.S.C. §§ 1915 and 1915A. Dkt. Nos. 1, 17, 26. The undersigned magistrate judge has considered Jaycox's complaint, his supplemental filings, authenticated records from TDCJ, and information from Jaycox submitted in

response to a questionnaire under *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976).

Dkt. Nos. 1, 7-1, 10, 19, 20, 21.  In accordance with the transfer order, the undersigned

now submits these findings, conclusions, and recommendation to the United States

District Judge for further consideration.

## 2.    Jaycox's Claims and the Authenticated Records

Liberally construing his pleadings, Jaycox asserts: (1) violations of the Americans

with Disability Act (ADA) and Rehabilitation Act of 1973 (RA); (2) failure to protect;

(3) excessive force; (4) deliberate indifference to serious medical needs; and

(5) conspiracy.  Dkt. No. 1 at 3–4.[1]  Jaycox also alleges that Defendants have obstructed

justice and defrauded the government.  *Id.* at 3.  He names as Defendants the following,

each in their individual capacities: (1) Bryan Collier, TDCJ Executive Director;

(2) Bobby Lumpkin, TDCJ Director; (3) Major J. Garcia; (4) Miss McCadney, mental

healthcare provider; (5) Mr. Castinelo, therapist; (6) A. Ballard, Grievance Investigator

II; (7) Warden John Lopez; (8) Sgt. Gomas; (9) D. Mars, Safe Prisons officer;

(10) Officer J. Flores; (11) Officer Camargo; and (12) Texas Tech University Mental

Healthcare-Medical Branch (Texas Tech).  Dkt. Nos. 1 at 3, 9, 11; 7-1 at 1; 29.  Other

than the TDCJ directors, Jaycox states that the Defendants are Montford Unit

employees.[2]  Dkt. No. 1 at 3; Dkt. No. 7-1 at 1.

---

[1] Page citations to Jaycox's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

[2] As such, the undersigned has not considered any possible claims arising out of incidents that occurred at other units, other than as discussed herein. *See infra* Section 4.D, G.

Jaycox's overarching allegation is that Defendants have engaged in a conspiracy to violate his constitutional rights. *See e.g.*, Dkt. Nos. 1 at 3; 21 at 4, 6–8, 11, 20. According to Jaycox, Director Collier is the mastermind, directing his subordinates to commit unlawful acts. Dkt. No. 21 at 6–7, 15. He states that beginning about two years ago, he fell behind on mental healthcare and was attacked. *Id.* at 13. He "figured it out that [Director] Collier—the whole TDCJ-I.D. agency and the Texas Tech"—"are all involved in a big crime to harm and try to get [him] killed by putting [him] in dangerous situations, failing to protect [him, and] treat [him]." *Id.* (cleaned up).

As part of this purported conspiracy, Jaycox asserts Defendants have failed to protect him. Dkt. No. 1 at 3–4. Jaycox is an ex-member of the Hermanos de Pistoleros Latinos, a prison gang. Dkt. No. 21 at 1. He asserts that in 2019 at the Ney Unit, an inmate named Domingo Hernandez—allegedly a member of a rival prison gang, the Texas Syndicate—"brutally assaulted" him. *Id.* Jaycox filed a life-endangerment report, and officers moved Hernandez to a different "dorm" at the unit. *Id.*

In 2021, officials transferred Jaycox to the Cotulla Unit because "prison gangs [were] threatening to assault him." *Id.* at 2. When he arrived, he told an officer about the gangs and Hernandez, but Jaycox claims that the officer assured him that the unit did not have gangs, nor was Hernandez there. *Id.* Upon entering his dorm, however, Jaycox contends Hernandez ran up and started assaulting him. *Id.*; Dkt. No. 7-1 at 5.

Jaycox filed grievances stating that his life was in danger, and after a Unit Classification Committee (UCC) hearing, an officer recommended he be transferred. *Id.* TDCJ moved Jaycox to the Allred Unit, but less than two months later, Hernandez

3

allegedly arrived on the same unit. *Id.* at 4. According to Jaycox, Hernandez threatened

to kill him, so Jaycox ran for help. *Id.* Officials transferred Jaycox to the Smith Unit. *Id.*

at 4–5. In Jaycox's view, the fact that he was allegedly placed on the same unit as

Hernandez two times after the initial assault illustrates the conspiracy to harm him. *Id.* at

4–5. But Jaycox also acknowledges that officials responded to his reports claiming that

his life was in danger by transferring him eight times in the last year. *Id.* at 20.

At the Smith Unit, Jaycox asserts he attempted suicide by hanging due to the

incidents at the Ney, Cotulla, and Allred Units. *Id.* at 6; Dkt. No. 1 at 7. After that,

officials transferred Jaycox to the Montford Unit. Dkt. No. 7-1 at 6–7.

Jaycox generally alleges that at the Montford Unit, Warden Lopez, Major Garcia,

Officer Mars, Miss McCadney, Sgt. Gomaz, and Officers Flores and Camargo have failed

to protect him by not assigning him to single-cell housing and placing him in unsafe

situations. Dkt. No. 21 at 8–11, 19–21; Dkt. No. 7-1 at 1. According to Jaycox, he told

Warden Lopez at an unspecified time that his life was "in grave danger by gang members

and by Domingo Hernandez." Dkt. No. 21 at 19–20 (cleaned up). Jaycox further alleges

that on June 9, 2023, another inmate assaulted him, and he again requested protection.

Dkt. Nos. 1 at 9; 21 at 17–18.

In response, officials placed him in a single cell for three days. Dkt. No. 1 at 9.

According to Jaycox, Sgt. Gomaz conducted an investigation and photographed his

injuries.[3]  *Id.*  Thereafter, the UCC found the assault substantiated but denied Jaycox the protective-custody, single-cell housing he requested.  *Id.*  Sgt. Gomaz then allegedly placed Jaycox back in the cell with the same individual who assaulted him.  *Id.*; Dkt. No. 21 at 15, 17–18.  Jaycox does not attribute any harm to the subsequent placement.  Dkt. No. 21 at 18.

Jaycox further asserts that Sgt. Gomaz used excessive force when he placed Jaycox back into the cell.  Dkt. No. 1 at 9.  Jaycox contends that Sgt. Gomez handcuffed and escorted him to the cell, where he tried "to force Jaycox" to accept the housing assignment.  *Id.*; Dkt. No. 21 at 18.  As a result, Jaycox suffered a cut on his head, scratches, and bruises.  Dkt. No. 21 at 18.

Jaycox also contends that although he was enrolled in the "psychiatric P.R.P. program" at Montford, he did not receive adequate services or treatment, which appears to center around his belief that he should be assigned to a single cell or placed into certain programs.  *Id.* at 7, 10–14.  Jaycox attributes this denial to Miss McCadney and Mr. Castinelo and claims that it is part of the conspiracy to harm him.  *Id.* at 10–14.

Jaycox further asserts Defendants, including Mr. Castinelo, Grievance Investigator Ballard, Warden Lopez, and Director Collier, conspired to defraud the government of money by accepting funds for programs Montford does not have and that Grievance

---

[3] Jaycox makes the contradictory allegation that officials did not conduct an OPI investigation.  Dkt. No. 1 at 9; Dkt. No. 21 at 15, 17–18.  Based on his assertions as a whole, however, the Court understands Jaycox as contending that the investigation was not conducted to his satisfaction or with the result he wanted—not that officials completely ignored his report.  *See* Dkt. No. 1 at 9; Dkt. No. 7-1 at 12–13 (attaching grievance related to June 9 incident with Warden Lopez's response).

Investigator Ballard disposed of his grievances to cover the alleged fraud, thereby obstructing justice. *Id.* at 14–15; Dkt. No. 1 at 3.

Finally, Jaycox alleges that Defendants have discriminated against him based on his disabilities in violation of the ADA and RA. Dkt. No. 1 at 3–4; Dkt. No. 21 at 16–17. Jaycox explains that he has several mental disabilities, including being schizophrenic and having post-traumatic stress disorder (PTSD), and he has "no use of the hands." Dkt. No. 21 at 16. He contends that Defendants denied him entry into the "MRIS early release" program,[4] which he qualified for during a previous incarceration and for which he believes he should again qualify. *Id.* at 16–17. He also alleges that Defendants failed to assign him to a single cell despite his disabilities, which "denied [him] safety-protection." *Id.* at 16; *see also* Dkt. No. 1 at 4, 10, 11–12. In Jaycox's view, the denials of programming and a single cell were discriminatory. Dkt. No. 21 at 16; Dkt. No. 1 at 12.

In relief, Jaycox seeks money damages and release from prison. Dkt. No. 1 at 4.

## 3.      Standard of Review

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain

---

[4] Medically Recommended Intensive Supervision (MRIS) "is an early release program for non-violent offenders who are terminally ill, physically handicapped, mentally ill, or have an intellectual development disorder and pose no threat to public safety." *Parole Division*, TEX. DEP'T OF CRIM. JUST., https://www.tdcj.texas.gov/divisions/pd/release_types.html (last visited Sept. 24, 2024).

governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). An action is frivolous if it lacks an arguable basis in either fact or law. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests on clearly fanciful or baseless factual contentions. *Id.* at 328; *see also Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992). It lacks an arguable basis in law if it embraces indisputably meritless legal theories. *Neitzke*, 490 U.S. at 327.

When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (per curiam) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)). Courts should accept well-pleaded factual allegations as true and should not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (per curiam). Although pro se pleadings are held to less stringent standards than those prepared by lawyers, plaintiffs must still plead factual allegations "that raise the right to relief above the speculative level." *Id.*; *see also Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (reiterating that conclusory allegations will not suffice).

4.    **Discussion**

   A.    **Jaycox seeks relief unavailable in this § 1983 action.**

"Generally, § 1983 suits are the proper vehicle to attack unconstitutional conditions of confinement and prison procedures[,]" while "[a] habeas petition . . . is the proper vehicle to seek release from custody." *Carson v. Johnson*, 112 F.3d 818, 820 (5th Cir. 1997) (providing that a habeas petition "is the proper vehicle to seek release from custody"). Accordingly, to the extent Jaycox asks this Court to release him from prison apart from any attack on prison procedures, he must pursue such relief through a petition for a writ of habeas corpus.[5] *See e.g., Newman v. Reed*, No. 3:18-CV-2679-N-BH, 2019 WL 652963, at *1–2 (N.D. Tex. Jan. 10, 2019) (recognizing that in a § 1983 action, only "declaratory or monetary relief" were available, so plaintiff failed to state a claim upon which relief could be granted by seeking dismissal of his state criminal case), *R. & R. adopted by* 2019 WL 652471 (N.D. Tex. Feb. 15, 2019). Thus, the undersigned recommends the district judge dismiss Jaycox's request for release.

   B.    **Jaycox's cannot bring his fraud claim.**

Jaycox alleges that Defendants defrauded the government by accepting funding for programs TDCJ does not provide to inmates. Dkt. Nos. 1 at 3; 21 at 8, 12. If Jaycox is attempting to assert a claim under a criminal statute, it fails because he possesses no right to have someone criminally prosecuted, and he cannot enforce criminal statutes through a civil request for relief. *See, e.g.*, *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990)

---

[5] The Court does not construe Jaycox's request as a habeas petition because he clearly filed this action under § 1983. *See* Dkt. No. 1 at 1–15.

(stating that there is no "constitutional right to have someone criminally prosecuted");
*Florance v. Buchmeyer*, 500 F. Supp. 2d 618, 626 (N.D. Tex. 2007) (explaining that "a private citizen cannot enforce criminal statutes in a civil action"). Moreover, Jaycox does not have standing to pursue the claim on behalf of the state or federal government—i.e., the aggrieved party. *See Naranjo v. Thompson*, No. PE:11–CV–00105–RAJ, 2012 WL 12925009, at *5 (W.D. Tex. Sept. 24, 2012).

For these reasons, the undersigned recommends the district judge dismiss Jaycox's claims based on the purported defrauding of the government.

### C.    Jaycox's claim that Grievance Investigator Ballard obstructed justice by destroying or not returning grievances fails to state a claim.

Jaycox contends that Grievance Investigator Ballard stole, destroyed, or did not return his grievances. Dkt. No. 1 at 3. Those grievances, Jaycox asserts, complained about the alleged conspiracy on which this action is based. Dkt. No. 21 at 15. He claims that the grievances were not returned as part of a conspiracy to keep him from suing. *Id.*

The undersigned has not considered whether Jaycox exhausted his administrative remedies in evaluating whether his claims survive screening under § 1915 because, "the district court assumes that a prisoner's claims have been exhausted when his grievances were not processed within prescribed time limits[.]" *Cf. Mahogany v. Miller*, 252 F. App'x 593, 594 (5th Cir. 2007) (per curiam).

If Jaycox is alleging that he did not receive due process based on Ballard's purported failure to adequately investigate his grievances, he cannot state a claim. A prisoner is not constitutionally entitled "to an adequate grievance investigation." *Elliott*

*v. United States*, No. 3:16-CV-3231-B, 2017 WL 3046872, at *2 (N.D. Tex. May 1,

2017); *see also Morris v. Cross*, 476 F. App'x 783, 785 (5th Cir. 2012) (rejecting

appellant's claim that prison official's failure to conduct an adequate investigation into

his grievance implicated due process concerns "because [appellant] lacks a protected

interest in a favorable resolution to his grievances").  Moreover, a prisoner "does not

have a federally protected liberty interest in having these grievances resolved to his

satisfaction." *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005) (per curiam); *see Aron

v. Green*, No. 4:14-CV-109-A, 2014 WL 1917543, at *2 (N.D. Tex. May 12, 2014)

("Denying plaintiff's grievances, or failing to resolve them in the manner preferred by

plaintiff, is not a violation of plaintiff's constitutional rights.").

> The undersigned recommends the district judge dismiss Jaycox's claim against

Grievance Investigator Ballard.

### D.    Jaycox has not pleaded sufficient facts demonstrating Defendants failed to protect him at the Montford Unit.

Prison officials have a constitutional duty to protect inmates from violence at the

hands of other prisoners. *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006).  Prison

officials must guard against current threats, as well as sufficiently imminent dangers that

may cause harm in the future, but not every injury caused by another prisoner gives rise

to constitutional liability. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (explaining that

"not . . . every injury suffered by one prisoner at the hands of another . . . translates into

constitutional liability for prison officials responsible for the victim's safety"); *Horton v.

Cockrell*, 70 F.3d 397, 400–01 (5th Cir. 1995).

10

To state a viable constitutional claim based on a failure to protect, a plaintiff must show that (1) he was subjected to conditions posing a substantial risk of serious harm, and (2) prison officials were deliberately indifferent to his need for protection. *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995). Deliberate indifference "is an extremely high standard to meet," and prison officials act with such indifference only if they know an inmate faces a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to alleviate it. *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001); *see also Farmer*, 511 U.S. at 837.

Consequently, officials' failure to alleviate a risk they should have perceived—but did not—does not constitute deliberate indifference. *See Farmer*, 511 U.S. at 837–38. Rather, the inmate must show that the official actually knew of and disregarded the excessive risk to inmate safety. *Id.* at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* The known risk must be more than just some level of risk and must be "excessive." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (per curiam).

Jaycox discusses several instances over several years where he believes TDCJ officials failed to protect him, beginning at the Ney Unit in 2019 and continuing through his assignment to the Montford Unit. *See* Dkt. No. 1 at 3–12. Other than the TDCJ directors, however, the only Defendants Jaycox sues are employees at the Montford Unit. Dkt. Nos. 1 at 3; 7-1 at 1. Jaycox thus appears to be asserting the following claims: (1) conspiracy predicated on Defendants' alleged failure to protect him over the past five

11

years; and (2) failure-to-protect against Director Collier over a five-year period and against Warden Lopez, Major Garcia, Officer Mars, Miss McCadney, Sgt. Gomaz, and Officers Camargo and Flores for incidents at the Montford Unit.

According to Jaycox, Directors Collier and Lumpkin know that he is mentally ill and should not be housed on "dangerous prison unit[s]" but nevertheless transferred him to the Ney, Cotulla, and Allred Units. Dkt. Nos. 21 at 1–3; 7-1 at 2. Jaycox states that Directors Collier and Lumpkin have knowledge of his condition and limitations by virtue of their positions as supervisors. Dkt. No. 21 at 7 (asserting that "Director Collier's Job as a[n] executive director for the TDCJ . . . [is to] know[] about every single inmate's history" (cleaned up)); Dkt. No. 7-1 at 2 (asserting Collier and Lumpkin are his custodians and are "by law required to keep a record of all known enemies . . . and to know where each inmate is at all times" (cleaned up)). Thus, Jaycox's view is that, as directors of TDCJ, Collier and Lumpkin "know[] about every single inmate's history, their known enemies, and all L.I.D. life [e]ndangerment [sic] filed claims for protection," along with "each inmate's living conditions and unit to unit transfers whom they can live with and whom they can't." Dkt. No. 21 at 7 (cleaned up). Jaycox acknowledges, however, that the State Classification Committee (SCC) is the entity responsible for his transfers. *Id.* at 2, 4. He merely holds Directors Collier and Lumpkin responsible because they are supervisors and because Jaycox believes Collier and Lumpkin conspired to harm him. *Id.* at 7; Dkt. No. 7-1 at 3 (claiming that Collier and Lumpkin, as "prison board directors" must have been involved in the assaults on him).

Jaycox also alleges that while at the Montford Unit, Warden Lopez, Major Garcia, Officer Mars, Miss McCadney, Sgt. Gomaz, and Officers Camargo and Flores failed to protect him by not assigning him to a single cell. Dkt. Nos. 21 at 8–11, 19–21; 7-1 at 1. According to Jaycox, he told Warden Lopez that his life was in grave danger by gang members and by Domingo Hernandez. Dkt. No. 21 at 20. Jaycox also alleges that on June 9, 2023, another inmate assaulted him, and he requested protection. Dkt. Nos. 1 at 9; 21 at 17–18.[6] In response, officials placed him in a single cell for three days. Dkt. No. 1 at 9. According to Jaycox, Sgt. Gomaz conducted an investigation and photographed his injuries. *Id.* Thereafter, the UCC found the assault substantiated, but it denied Jaycox the single-cell protective housing that he requested. *Id.* Sgt. Gomaz then allegedly placed him back in the cell with the same individual who assaulted him. *Id.*; Dkt. No. 21 at 15, 17–18. Jaycox does not attribute any harm to this incident. Dkt. No. 21 at 18.

### i. Directors Collier and Lumpkin

Supervisory officials are not vicariously liable for the acts of their subordinates unless (1) the supervisors affirmatively participated in an act that caused a constitutional deprivation or (2) implemented an unconstitutional policy that caused injury to the plaintiff. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)). A prisoner must sufficiently

---

[6] The Court provided Jaycox an opportunity to list the dates he requested protective custody, along with the person(s) to whom he made the request(s) and supporting details about those request(s). Dkt. No. 21 at 16. Jaycox only reasserted his general allegations that he requested protective custody from various officials on unspecified dates. *Id.* at 16–17.

allege facts showing either personal involvement in the alleged deprivation or

implementation of an unconstitutional policy. *Thompkins*, 828 F.2d at 303.

Jaycox does not allege that Directors Collier and Lumpkin implemented an

unconstitutional policy. Dkt. Nos. 1 at 3; 7-1 at 1–7; 21 at 1–7. Instead, Jaycox alleges

that these directors were personally involved in failing to protect him from attacks

beginning in 2019. *See* Dkt. Nos. 7-1 at 2–4, 7; 21 at 1–7. Stripping Jaycox's pleadings

of conclusory assertions related to what he assumes Directors Collier and Lumpkin must

have known in their supervisory capacities, he alleges no facts to show that they were

personally involved in the purported failure to protect. For example, he does not allege

that either director personally signed his transfer papers, that he discussed housing

assignments with them, that they personally responded or otherwise demonstrated

awareness of his life-in-danger filings, or that they actively participated in the SCC or

UCC decisions.[7] *See, e.g.*, Dkt. No. 7-1 at 3.

_____

[7] The Fifth Circuit has outlined the interplay between the UCC and SCC:

> TDCJ–CID has a procedure to investigate and evaluate life endangerment claims. The
> complaint is first logged with the unit classification office in the offender protection log.
> The complaint is then assigned to a ranking officer to conduct an investigation, which,
> when completed, is returned to the unit classification office. The unit classification office
> then sets the claim for a hearing before the next available [UCC].

> A UCC consists of three voting members, who review and make recommendations
> regarding an inmate's custodial classification while at the unit. A recommendation to
> change an inmate's classification requires a majority vote. The UCC may recommend a
> housing change, placement in safekeeping, placement in protective custody, or a unit
> transfer. The [SCC] . . . has to approve the UCC's recommendations regarding
> safekeeping, protective custody, and unit transfers. Even in the face of an SCC denial,
> prison officials with the rank of Major . . . have the power to assign inmates to transient
> housing or move them to safer parts of the unit.

*Moore v. Lightfoot*, 286 F. App'x 844, 845 n.2 (5th Cir. 2008) (per curiam).

Indeed, Jaycox concedes that he is suing Director Collier because of his role as a supervisor. Dkt. No. 21 at 7 (responding "yes" to the question as to whether he alleges "that as a supervisor, Executive Director Collier is responsible for the allegedly unlawful acts of his subordinates"). And contrary to his allegation that Directors Collier and Lumpkin approved his transfers, Jaycox concedes that it was the SCC that was responsible for the moves. *Id.* at 2 ("Bryan Collier – S.C.C. approved the transfer." (cleaned up)), 4 (stating that the Cotulla Unit warden sent his recommendation for a transfer to the SCC), 5 ("The S.C.C. Bryan Collier was caught 2 times for purposely constructing these attacks to happen to inmate Jaycox . . . ." (cleaned up)); Dkt. No. 7-1 at 3 ("The only officials that can make these unit to unit transfers is the Huntsville Prison Board Committee . . . [also known as] State Classifications Committee."), 4 (alleging that he had to stay at the Ney Unit "because Huntsville-the Prison Board-Classifications Director's Committee transferred Jaycox [t]here . . . Bryan Collier, Bobbie Lumpkin." (cleaned up)). To the extent that he attempts to suggest that Collier and/or Lumpkin were part of the SCC—which he does not explicitly allege—the SCC would still have been the decisionmaker, not the individual directors. *See Moore*, 286 F. App'x at 845 n.2.

Absent well-pleaded facts showing that Directors Collier and Lumpkin were personally involved in the housing assignments and transfers, Jaycox's assertion amounts to an unactionable claim of vicarious liability. *See Stout v. LeBlanc*, 599 F. App'x 170, 171 (5th Cir. 2015) (per curiam) (affirming district court's grant of summary judgment on prisoner's failure-to-protect claim, where "there [wa]s no evidence that [defendant] had any personal involvement in [prisoner's] custody classification"); *Murphy v. Kellar*, 950

15

F.2d 290, 292 (5th Cir. 1992) ("[A] plaintiff bringing a section 1983 action must specify the personal involvement of each defendant."). The undersigned therefore recommends dismissal of Jaycox's failure-to-protect claim against Directors Collier and Lumpkin.[8]

### ii.    Montford Unit Warden Lopez

As to Jaycox's failure-to-protect claim against Warden Lopez, Jaycox has not demonstrated that he was housed in conditions posing a substantial risk of serious harm, nor has he shown Lopez was deliberately indifferent to his need for protection. Jaycox generally asserts that he was in danger at the Montford Unit, but he pleads no facts showing that he was housed under conditions posing a substantial risk of harm. *See* Dkt. Nos. 1 at 4–12; 21 at 8–9; *see* Dkt. No. 7-1 at 8–9 (showing that Warden Lopez responded to Jaycox's grievance by stating that his complaint had been "investigated and

---

[8] The undersigned also notes that any failure-to-protect claim against Directors Collier and Lumpkin based on the 2019 incident at the Ney Unit is likely time-barred. Dkt. No. 21 at 1–6 (asserting that, as a result of an attack, he suffered a broken nose and hand, fractured wind pipe, and bruises and lacerations); *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001) (stating that § 1983 claims filed in Texas have a two-year statute of limitations and "the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured"). And despite that any claims based on the 2021 Cotulla Unit attack and the attempted attack at the Allred Unit are filed in the wrong division, the undersigned has considered Jaycox's these claims as part of his conspiracy claim. As discussed herein, Jaycox can only state a viable conspiracy claim if he alleges a viable constitutional violation. *See infra* Section 4.G.

Finally, even if Jaycox has pleaded sufficient facts supporting Directors Collier's or Lumpkin's personal involvement, his allegations fail to show that they were aware Jaycox was transferred to the same unit (the Cotulla and Allred Units) where Hernandez was housed and then consciously disregarded that risk. Rather, Jaycox states that the directors *must* have been aware because of the positions they hold. This is not sufficient. At best, Jaycox's allegations reflect his subsequent transfers were negligent, which does not rise to the level of deliberate indifference. *Farmer*, 511 U.S. at 835 ("Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests or safety." (internal quotation marks and citation omitted)); *cf. Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004) (stating that "given the size of the operation that [TDCJ's executive director and director of classification] oversee, they cannot be expected to intervene personally in response to every inmate letter they receive," and therefore "referring the matter for further investigation or taking similar administrative steps" is a reasonable discharge of their duty to protect inmates).

reviewed" and although found to be unsubstantiated, he was "listed as not for same housing" as the inmates who purportedly harmed him). Jaycox's vague allegation that his mental impairments or status as an ex-gang member somehow put Warden Lopez on notice that Jaycox faced a substantial risk of harm is insufficient. *See* Dkt. Nos. 1 at 9; 21 at 8–9, 20–21.

In addition, Jaycox acknowledges that Warden Lopez did not ignore his complaints but instead "granted" two life-in-danger claims. Dkt. No. 21 at 8. Jaycox merely disagrees with Warden Lopez's denial of single-cell housing. *Id.* But that, standing alone, does not demonstrate that Warden Lopez was deliberately indifferent.[9] *See Stout*, 599 F. App'x at 171 (observing that an inmate's disagreement with a classification is insufficient to establish a constitutional violation); *Parker v. Currie*, 359 F. App'x 488, 490 (5th Cir. 2010) (per curiam) (explaining that a prisoner's allegations boiled down to a disagreement over housing status, and mere disagreement with a classification is insufficient to establish a constitutional violation).

For these reasons, Jaycox's claim against Warden Lopez should be dismissed. *See, e.g., Gottke v. Winn Corr. Ctr.*, 789 F. App'x 479, 480 (5th Cir. 2020) (per curiam) (holding that a prisoner did not state a failure-to-protect claim where he merely alleged that unidentified prison officials failed to protect him from an attack by another inmate after he requested to be moved); *Silva v. Moses*, 542 F. App'x 308, 311 (5th Cir. 2013)

---

[9] Jaycox has not been medically recommended for a single cell. Dkt. No. 21 at 17 (asserting that during a previous incarceration, medical staff on the Jester Unit recommended he be housed in a single cell for twelve months).

(per curiam) (affirming the dismissal of a prisoner's failure-to-protect claim because the "vague contention" that "although the defendants knew of previous violent incidents, they declined to take unspecified protective measures to prevent future attacks" did not show that any risk was clear to the officers); *Smith v. Jaramillo*, 394 F. App'x 183, 185 (5th Cir. 2010) (per curiam) (deliberate indifference requires a showing of actual knowledge and appreciation of the risk).

### iii.    Sgt. Gomaz

Jaycox's claim against Sgt. Gomaz also fails. Jaycox contends that Sgt. Gomaz unlawfully placed him back into the four-person cell with "the same inmate that assaulted him on June 13 or 14, 2023." Dkt. No. 1 at 9 (cleaned up). Jaycox does not assert, however, "that he suffered any subsequent injury giving rise to a failure-to-protect claim." *Moorman v. Jowers*, 313 F. App'x 733, 735 (5th Cir. 2009) (per curiam); *see* Dkt. Nos. 1 at 9; 21 at 9–10, 17–21.

In addition, Jaycox concedes that Sgt. Gomaz responded to his report that his cellmate assaulted him and investigated the allegation; Jaycox merely disagrees with the outcome of the investigation. *See* Dkt. Nos. 1 at 9; 21 at 9–10 (acknowledging that in June 2023, D. Mars, a Safe Prisons officer, investigated but denied Jaycox's protection request). A negligent response does not amount to deliberate indifference. *See Lands v. Lemoine*, 566 F. App'x 356, 357 (5th Cir. 2014) (per curiam). For these reasons, Jaycox's claim against Sgt. Gomaz fails.

### iv.     Officers Camargo and Flores

Jaycox makes similar allegations against Officers Camargo and Flores—i.e., that they "refused" to move him to protect him, he was then assaulted, and Officer Camargo issued a "false disciplinary"[10] against Jaycox.  Dkt. No. 7-1 at 1.  But Jaycox pleads no facts showing that he communicated information to Officers Camargo and Flores prior to the purported assault such that they were aware of a serious risk of harm and that they ignored that risk.  *Id.*  Thus, his claim against the officers should be dismissed.

### v.     Officer Mars and Miss McCadney

As to the other Defendants—Officer Mars and Miss McCadney—Jaycox again pleads no facts in support of his failure-to-protect claim.  Instead, he generally contends they should have placed him in a single cell to protect him from harm.  Dkt. Nos. 21 at 9–11; 7-1 at 1.  But Jaycox's generalized fear of attack—whether predicated on his former gang affiliation or mental condition—does not show that he was subjected to a substantial risk of harm, and he has not demonstrated that Officer Mars and Miss McCadney were deliberately indifferent to any such risk.  *Buentello v. State Classification Comm. Members*, No. H–12–2537, 2013 WL 3480740, at *4 (S.D. Tex. July 10, 2013) (dismissing a prisoner's failure-to-protect claim because a generalized fear of attack did

---

[10] The undersigned does not understand Jaycox as alleging a claim against Camargo based on the purportedly false disciplinary charge. *See* Dkt. No. 7-1 at 1.  Even if he intended to sue on that basis, however, his claim is devoid of factual support and should be dismissed. *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 520 (5th Cir. 2016) (stating that courts accept all well-pleaded facts as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements cannot establish facial plausibility") (internal quotation marks omitted).

not establish a substantial risk of harm or put defendants on notice that he was at
imminent risk of harm).

In sum, the undersigned recommends that the district judge dismiss Jaycox's
failure-to-protect claims against all Defendants for failure to state a claim.

**E.    Jaycox's excessive force claim against Sgt. Gomaz should be dismissed.**

Jaycox alleges that Sgt. Gomaz used excessive force but asserts scant facts in
support. *See* Dkt. No. 21 at 18; Dkt. No. 1 at 9.  Jaycox identifies no action Sgt. Gomaz
took that was excessive and alleges *de minimis* injuries resulting from the incident.  Dkt.
No. 21 at 18.  He also concedes that he disobeyed orders, which prompted Sgt. Gomaz to
use force.  Dkt. No. 1 at 9.  Thus, the undersigned recommends dismissal of his claim.

To establish a constitutional violation for excessive use of force by a prison
official, a plaintiff must show that the defendant unnecessarily and wantonly inflicted
pain. *Whitley v. Albers*, 475 U.S. 312, 320 (1986).  Whether an official's use of force is
unnecessary or wanton depends on if the "force was applied in a good faith effort to
maintain or restore discipline or maliciously or sadistically for the very purpose of
causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley*, 475 U.S. at
320–21).  Factors relevant to this determination include, but are not limited to, the
following: (1) the extent of the prisoner's injury; (2) "the need for application of force";
(3) "the relationship between that need and the amount of force used"; (4) "the threat
reasonably perceived by the responsible" officers; and (5) any efforts officers made to
temper the severity of a forceful response. *See Hudson*, 503 U.S. at 7 (internal quotation
marks omitted); *Baldwin v. Stalder*, 137 F.3d 836, 838 (5th Cir. 1998).

"The amount of force that is constitutionally permissible . . . must be judged by the context in which that force is deployed." *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996). Although the core judicial inquiry is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm, the extent of a prisoner's injuries may provide indication of the amount of force applied. *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010). Thus, the absence of serious injury is a factor relevant to determining whether the force at issue violated the Constitution. *Id.*

Jaycox alleges Sgt. Gomaz's use of force—applied in response to his refusal to enter a cell—resulted in a cut on his head, scratches, and bruises all over his body. Dkt. No. 21 at 18. These injuries are *de minimis*, suggesting that whatever force Sgt. Gomaz applied was not excessive. *See Siglar v. Hightower*, 112 F.3d 191, 193–94 (5th Cir. 1997) (concluding that a prisoner's sore, bruised ear which healed after three days was a *de minimis* injury); *Hodge v. Williams*, No. 4:08–CV–330–Y, 2009 WL 111565, at *3 (N.D. Tex. Jan. 16, 2009) (finding as *de minimis* inmate's claimed injuries of "cuts on his hand, a cut inside his lip and a sore neck").

The other *Hudson* factors likewise direct a finding that Sgt. Gomaz did not use excessive force. Jaycox concedes that he disobeyed Sgt. Gomaz's order to accept a housing assignment, and in response, Gomaz handcuffed him, held his arm, and "tr[ied] to force Jaycox into a cell." Dkt. No. 1 at 9 (cleaned up). Disobeying orders poses a threat to the order and security of the prison as an institution. *Rios v. McBain*, 504CV84, 2005 WL 1026192, at *7 (E.D. Tex. Mar. 21, 2005) (explaining that "open defiance of orders plainly poses a threat to the security of the institution, regardless of whether or not

the defiance is emanating from within a locked cell"), *R. & R. adopted by* 2005 WL

1026192 (E.D. Tex. Apr. 28, 2005).  This is true even where an officer incorrectly

directs, as Jaycox contends here, an inmate to accept housing in a cell that the inmate

believes is unsafe.  *Cf. Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984) (observing

that "[i]nmates cannot be permitted to decide which orders they will obey, and when they

will obey them").  Jaycox's refusal justified some degree of force, and Sgt. Gomaz could

have reasonably perceived the refusal as a threat to safety and institutional order.

Moreover, Jaycox did not identify an action Sgt. Gomaz took that Jaycox believes

was excessive, despite the Court's prompting to do so. Dkt. No. 21 at 18.  Standing

alone, the Court cannot conclude Sgt. Gomaz cuffing Jaycox and "trying to force" him

into a cell amounted to force disproportionate to the need.  *See McCoy v. Esquivel*, 798 F.

App'x 818, 819–20 (5th Cir. 2020) (per curiam) (affirming the determination at summary

judgment that an officer's use of force—pushing the prisoner to the floor and "smashing

his head to the ground"—"was not unreasonable given [prisoner's] refusal to comply

with orders and his downward movement" (brackets and internal quotation marks

omitted)).  And because Jaycox's factual allegations are sparse, the Court cannot

determine whether Sgt. Gomaz made any attempt to temper his force, although the minor

nature of Jaycox's injuries certainly suggest so.

In sum, weighing the *Hudson* factors, the undersigned concludes that Jaycox has

failed to plead facts showing that Sgt. Gomaz applied force maliciously or sadistically.

The undersigned therefore recommends dismissal of Jaycox's excessive-force claim for

failure to state a claim.

F.     **Jaycox has not pleaded facts demonstrating Defendants were
deliberately indifferent to his serious medical needs.**

The Constitution requires that prison officials provide adequate medical care.

*Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013).  An inmate or detainee seeking to

establish an Eighth Amendment violation regarding medical care must allege facts

showing that prison officials were deliberately indifferent to his serious medical needs.

*Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only

the unnecessary *and wanton* infliction of pain implicates the Eighth Amendment, a

prisoner advancing such a claim must, at a minimum, allege deliberate indifference to his

serious medical needs" (internal quotation marks omitted) (emphasis in original)).

"Deliberate indifference is an extremely high standard to meet." *Brewster*, 587 F.3d at

770 (internal quotation marks omitted).

The deliberate-indifference standard requires satisfaction of both an objective and

a subjective component. *Rogers*, 709 F.3d at 410.  An inmate must prove "objective

exposure to a substantial risk of serious harm." *Gobert v. Caldwell*, 463 F.3d 339, 345

(5th Cir. 2006).  Regarding the subjective component, an official acts with deliberate

indifference only where he (1) knows the inmate faces a substantial risk of serious harm

and (2) disregards that risk by failing to take reasonable measures to abate it. *Farmer*,

511 U.S. at 847; *Gobert*, 463 F.3d at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159

(5th Cir. 1999) (per curiam) (stating that a prison official is not liable for the denial of

medical treatment unless he knows of and disregards an excessive risk to inmate health or

safety).

An official's "failure to alleviate a significant risk that the official should have perceived, but did not[,] is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756 (internal quotation marks omitted). Likewise, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770; *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and the inmate must show that the prison official was actually aware of the risk of harm and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). A delay in delivering medical care creates constitutional liability only where the alleged deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). In sum, to state a viable Eighth Amendment claim for deliberate indifference to serious medical needs, an inmate must demonstrate that prison staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

Jaycox's medical-care claim is primarily based on Defendants' alleged denial of single-cell assignment and admission to certain programs. *See, e.g.*, Dkt. No. 21 at 10–11 (alleging Miss McCadney denied his requests for single-cell restriction and for placement in the DDP program),[11] 12 (stating that Mr. Castinelo told him he does not qualify for the DDP program "or any rehabilitative treatment"), 19 (asserting Texas Tech denied him access to programs for which he was qualified). He also alleges Miss McCadney, Director Collier, and Mr. Castinelo denied him treatment for his mental-health conditions. *See* Dkt. No. 21 at 11–13.

"The Eleventh Amendment bars suit against a state entity, as opposed to a state official, regardless of whether money damages or injunctive relief is sought." *Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183, 186 (5th Cir. 1986). Accordingly, any deliberate-indifference claim against Texas Tech must be dismissed because it possesses sovereign immunity under the Eleventh Amendment. *United States v. Tex. Tech Univ.*, 171 F.3d 279, 289 n.14 (5th Cir. 1999) (holding that "[t]he Eleventh Amendment cloaks Texas Tech University and Texas Tech University Health Sciences Center with sovereign immunity as state institutions").

Without more, Jaycox's contention that Defendants denied him entry into certain programs—including the DDP and MRIS—does not demonstrate that they refused to

---

[11] As part of the Developmental Disabilities Program (DDP), all inmates are screened for developmental disabilities within fourteen days of arrival to TDCJ custody. *Referral of Inmates to the Developmental Disabilities Program (DDP)*, CORR. MANAGED HEALTH CARE POLICY MANUAL A-08.3, https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_policy_manual/A-08.03.pdf. The assessments are "conducted by specially trained TDCJ personnel." *Id.*

treat him "or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert*, 463 F.3d at 346. Instead, Jaycox's allegation reflects a disagreement with the prison's assessment of his medical needs and the care provided for those needs, which does not implicate the Constitution. *E.g.*, *Walls v. Tex. Dep't of Crim. Just.*, 270 F. App'x 358, 358 (5th Cir. 2008) (per curiam) (affirming the dismissal of a prisoner's deliberate-indifference claim based on the allegation that physicians determined "the installation of a skull plate [was not] necessary," because a "disagreement with the treatment he received does not give rise to a constitutional violation"); *Dugas v. Quintero*, No. 2:17-CV-48, 2019 WL 7987920, at *9 (S.D. Tex. Oct. 2, 2019) (concluding that prisoner's argument regarding the lack of a medical transfer "amount[ed] to his dissatisfaction with [defendant's] medical judgment," which did not support a deliberate-indifference claim).

Finally, the authenticated medical records, viewed in conjunction with Jaycox's allegations, show that Defendants did not ignore his complaints or otherwise engage in conduct showing a wanton disregard for his serious medical needs. Jaycox contends that Montford's psychiatric program is a "sham" because the only program or psychiatric care it offers is therapy "once every 3 weeks . . . for 5 minutes or less." Dkt. No. 7-1 at 7. But Jaycox acknowledges that Mr. Castinelo, a therapist, briefly visited with him at least twice, and that he "was seen 4 times by psychiatric check ins." Dkt. No. 21 at 11–12. That is, Jaycox's pleadings bely his contention that he received no care.

The records further show that upon arrival to the Montford Unit on June 2, 2023, medical staff conducted a psychiatric evaluation for possible admission into inpatient

26

care. Jaycox was admitted, and on June 8, staff performed a follow-up exam. Five days

later, a different therapist met with Jaycox and then another therapist performed a

psychosocial evaluation. After Jaycox submitted a sick call request stating that he was

very scared, suffering panic attacks, and hearing voices, staff visited him cell-side. On

July 7, staff conducted a psychiatric follow-up examination, and the physician's assistant

(PA) documented that Jaycox "appear[ed] to be improved since admission" because he

was "more organized and focused." The same PA evaluated him again on July 25, and

after that, Mr. Castinelo conducted several therapy sessions.

In sum, while Jaycox may have desired longer therapy sessions or additional

services aimed at addressing his mental-health concerns, such allegations amount to a

disagreement with the type or quality of care he received. He has not pleaded any facts

showing that Defendants were deliberately indifferent to his serious medical needs. The

undersigned therefore recommends the district judge dismiss Jaycox's claim that he was

denied adequate medical care for failure to state a claim.

### G.   Jaycox's allegation that Defendants conspired to deprive him of his constitutional rights is conclusory and implausible.

"To establish a conspiracy claim under § 1983, the plaintiff must show that there

was an agreement among the alleged co-conspirators to deprive him of his constitutional

rights and that such an alleged deprivation actually occurred." *Montgomery v. Walton*,

759 F. App'x 312, 314 (5th Cir. 2019) (per curiam). "Conclusory allegations that do not

reference specific factual allegations tending to show an agreement do not suffice to state

a civil rights conspiracy claim under § 1983." *Id.*; *Lynch v. Cannatella*, 810 F.2d 1363,

1369–70 (5th Cir. 1987) ("Plaintiffs who assert conspiracy claims under civil rights statutes must plead the operative facts upon which their claim is based. Bald allegations that a conspiracy existed are insufficient."); *Chadman v. Quisenberry*, No. 4:17-CV-700-Y, 2019 WL 3530422, at *6 (N.D. Tex. Aug. 2, 2019) ("Conspiracy claims under § 1983 require that the claimant relate specific facts."). "Therefore, to establish his conspiracy claim, [plaintiff] must plead specific, nonconclusory facts that establish that there was an agreement among the defendants to violate his federal civil rights." *Montgomery*, 759 F. App'x at 314.

Jaycox has not pleaded such facts. Regarding his allegations of inadequate medical care, without an underlying § 1983 violation, Jaycox cannot state an actionable conspiracy claim. *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995) (observing that a conspiracy may be charged under § 1983 as "the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act," but there can be no conspiracy claim without an actual violation of section 1983").

Moreover, Jaycox has made only conclusory assertions in support of his conspiracy claim. Jaycox pleads no facts demonstrating Defendants reached any agreement to deprive him of his constitutional rights. Dkt. No. 21 at 7, 10–12, 14. To the contrary, Jaycox's allegations reflect that he personally believes Director Collier is the mastermind behind the alleged constitutional violations and his subordinates are merely following his directives. *See, e.g.*, Dkt. No. 21 at 7–8, 11, 15. This is insufficient to show Defendants agreed to violate Jaycox's constitutional rights, particularly where Jaycox has not "identif[ied] . . . time, date, or circumstance." *Montgomery*, 759 F. App'x

28

at 314; *see Tebo v. Tebo*, 550 F.3d 492, 497 (5th Cir. 2008) (affirming the district court's grant of summary judgment on plaintiff's conspiracy claim, where the plaintiff alleged no facts showing that defendants acted in agreement to commit an illegal act); *Blakely v. Andrade*, 360 F. Supp. 3d 453, 490 (N.D. Tex. 2019) (recommending dismissal at screening on plaintiff's conspiracy claim because he did not demonstrate defendants agreed to commit an unlawful act).

For these reasons, the undersigned recommends the district judge dismiss Jaycox's conspiracy claim.

### H.    Jaycox has pleaded sufficient facts to state a claim under the ADA and RA against TDCJ and Texas Tech but any claims against Defendants in their individual capacities should be dismissed.

The ADA and the RA prohibit prisons from discriminating against prisoners on the basis of a disability. *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020). To state a viable claim under the ADA or RA, a plaintiff must show the following:

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Epley v. Gonzalez*, 860 F. App'x 310, 312 (5th Cir. 2021) (per curiam) (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)). A plaintiff may satisfy the third prong by showing officials failed to reasonably accommodate him. *Valentine v. Collier*, 993 F.3d 270, 290 (5th Cir. 2021). "A plaintiff proves a failure to accommodate by showing that the disability and its consequential limitations were known by the

covered entity, and the entity failed to make reasonable accommodations." *Id.* "The remedies, procedures, and rights available under the [RA] parallel those available under the ADA." *Id.* "Thus, jurisprudence interpreting either section is applicable to both." *Id.* (internal quotation marks, brackets, and citation omitted).

To the extent Jaycox sues Defendants in their individual capacities under the ADA and RA, his claim fails. Only public entities are amenable to suit under the ADA and RA—not defendants in their individual capacities. *Smith v. Hood*, 900 F.3d 180, 184 n.6 (5th Cir. 2018); *Nottingham v. Richardson*, 499 F. App'x 368, 376 n.6 (5th Cir. 2012).

Regarding the substance of his ADA and RA claims, Jaycox has not pleaded facts showing Defendants excluded him from the MRIS or DDP programs based on his disability. To the contrary, Jaycox attributes his alleged rejection from the programs to Defendants punishing him because his family has "a history . . . of suing prison officials." Dkt. No. 21 at 16 (identifying MRIS as the program to which he was denied access and blaming that denial on his litigation history). He also acknowledges that unit providers determined he does not qualify based on the programs' criteria, not that they denied him admission because of his disabilities.[12] *Id.* As such, he cannot state a claim. *See Nottingham*, 499 F. App'x at 377 (affirming dismissal of a prisoner's ADA claim where he presented "no evidence that the allegedly improper action of leaving [him] on the floor of the transit van had any connection to his alleged disability" or "that he was treated differently because of his disability"); *Thomas v. Nino*, No. 23-40385, 2024 WL

---

[12] He does not allege that the criteria are discriminatory; for example, he does not allege that he was rejected for any program because the program does not accommodate individuals with certain disabilities.

4039743, at *3 (5th Cir. Sept. 4, 2024) (affirming dismissal of a prisoner's ADA and RA claims in part because he "did not allege he was being denied the ability to access any TDCJ program, service, or activity due to his disability" (internal quotation marks omitted)).

Jaycox's claims against TDCJ and Texas Tech based on his housing assignment, however, survive screening. Liberally construing Jaycox's pleadings, he asserts that because of his qualifying disabilities—including schizophrenia and PTSD—he required placement in a single cell for safety reasons, but Defendants denied him such placement. Dkt. No. 1 at 11–12 (asserting that "Jaycox requested to be placed in protective custody-single cell for medical-mental health disorders," but he "was in fact denied that safety-protection," thereby violating his rights under the ADA and RA.); *see id.* at 4, 10; Dkt. No. 21 at 16. Jaycox acknowledges that no medical professional prescribed single-cell placement during his current incarceration, but he states that during a prior incarceration he was housed in a single cell for twelve months. Dkt. No. 21 at 17.

Because Jayocx has alleged that he has a qualifying disability, that he provided notice of his need for an accommodation by way of his repeated requests for single-cell housing, and that the institutional defendants failed to act, he has pleaded sufficient facts to proceed beyond screening. *See, e.g.*, *Epley*, 860 F. App'x at 314 (holding prisoner's allegation that officials knew he had a single-cell restriction but still housed him with other inmates sufficiently stated a failure-to-accommodate claim based on the denial of safe prison housing); *Douthit v. Collier*, No. 20-20550, 2022 WL 5240152, at *2 (5th Cir. Oct. 5, 2022) (determining that the prisoner "has met the three elements required for an

ADA failure-to-accommodate claim—qualifying disability . . . , notice ([p]risoner's

statements to [d]efendants and filed grievances), and failure to provide reasonable

accommodation ([d]efendants' failure to act)."); *Estrada v. Dir., TDCJ-CID*, No. 5:20-

CV-00030-H, 2022 WL 16919789, at *8 (N.D. Tex. Nov. 14, 2022) (permitting

prisoner's ADA and RA claim to proceed beyond screening, where he alleged TDCJ

refused single-cell assignment despite psychiatrist's recommendation).

The undersigned therefore recommends the district judge require an answer from

TDCJ and Texas Tech as to Jaycox's ADA and RA claims based on his housing

assignment. The undersigned further recommends the district judge dismiss Jaycox's

individual-capacity claims and any claim based on the purported denial of admission into

the MRIS and/or DDP programs.

5.    **Recommendation**

The undersigned recommends that the United States District Judge dismiss with

prejudice all Jaycox's claims in accordance with 28 U.S.C. §§ 1915 and 1915A, except

those under the ADA and RA based on the alleged denial of single-cell housing. As to

those claims, the undersigned recommends that the district judge require Defendants

TDCJ and Texas Tech University to answer or otherwise plead.

6.    **Right to Object**

A copy of these findings, conclusions, and recommendation shall be served on all

parties in the manner provided by law. Any party who objects to any part of these

findings, conclusions, and recommendation must file specific written objections within

fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); FED. R.

C IV. P. 72(b).  To be specific, an objection must identify the specific finding, conclusion,

or recommendation to which objection is made, state the basis for the objection, and

specify the place in the magistrate judge's Findings, Conclusions, and Recommendation

where the disputed determination is found.  An objection that merely incorporates by

reference or refers to the briefing before the magistrate judge is not specific.  Failure to

file specific written objections will bar the aggrieved party from appealing the factual

findings and legal conclusions of the magistrate judge that are accepted or adopted by the

district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto.*

*Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: October ___3___, 2024.

_____

**AMANDA ('AMY' R. BURCH**
**UNITED STATES MAGISTRATE JUDGE**